*529 KELLY, J.
(dissenting). In a series of recent cases involving juvenile offenders,[1] the United States Supreme Court has established that “children are different” as a matter of constitutional law.[2] Specifically at issue here is the application of one of those recent cases, Miller v Alabama, to incarcerated juvenile offenders whose direct appeals were complete when the Supreme Court decided Miller. In Miller, the Supreme Court determined that, because certain juvenile homicide offenders have “diminished culpability” when compared with adult offenders, states cannot subject juvenile homicide offenders to mandatory nonparolable life sentences.[3] By doing so, the Court expanded the range of punishments that may be imposed on juvenile homicide offenders in states, like Michigan, that had previously mandated a nonparolable life sentence whenever a juvenile offender was convicted of first-degree murder in the circuit court. We conclude that Miller applies retroactively to cases appearing before us on collateral review, including in People v Carp and People v Davis, because it established a substantive rule of law. Alternatively, state law compels the retroactive application of Miller. Accordingly, we would reverse in Carp and Davis and remand those cases to the St. Clair Circuit Court and Wayne Circuit Court, respectively, for resentencing pursuant to MCL 769.25a.[4]
*530 I. THE EIGHTH AMENDMENT APPLIED TO JUVENILE OFFENDERS
The Eighth Amendment of the United States Constitution prohibits the infliction of “cruel and unusual punishments”[5] and has a long history in American and English law predating the Bill of Rights. Similar protections were provided in various state constitutions,[6] and identical language appeared in the English Bill of Rights of 1689.[7] Even farther back in time, a prohibition of excessive punishments appeared in the Magna Carta.[8]
“ ‘The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.’ ”[9] For more than a century, the Supreme Court has main *531 tained that the Clause does not have a fixed meaning,[10] but instead “may acquire meaning as public opinion becomes enlightened by a humane justice.”* [11] One meaning the Supreme Court has developed over the last decade is that “children are constitutionally different from adults for purposes of sentencing.”[12] In Roper v Simmons, the Court forbade imposition of the death penalty on juvenile offenders.[13] In Graham v Florida, the Court prohibited “the imposition of a life without parole sentence on a juvenile offender who did not commit homicide.”[14] Most recently, in Miller v Alabama, the Court struck down a sentencing scheme that provided a mandatory nonparolable life sentence for juvenile homicide offenders.[15]
In these rulings, the Court relied on three significant differences between juveniles and adults to conclude that juveniles have “diminished culpability” for their crimes and “greater prospects for reform.”[16]
*532 First, children have a “ ‘lack of maturity and an underdeveloped sense of responsibility,’ ” leading to recklessness, impulsivity, and heedless risk-taking. Second, children “are more vulnerable ... to negative influences and outside pressures,” including from their family and peers; they have limited “contro [1] over their own environment” and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child’s character is not as “well formed” as an adult’s; his traits are “less fixed” and his actions less likely to be “evidence of irretrievabl[e] deprav[ity].”[17]
These differences between juveniles and adults “diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.”[18] In this respect, Miller relied heavily on Graham, explaining that Graham “insisted] that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole.”[19] Because an offender’s age “ ‘is relevant to the Eighth Amendment,’ . . . ‘criminal procedure laws that fail to take defendants’ youthfulness into account at all would be flawed.’ ”[20]
Not only is age relevant in establishing an offender’s culpability for the crime, as already explained in this opinion, but it is also relevant in determining whether punishment for a crime is sufficiently comparable in *533 severity to an identical sentence given to an adult offender. Sentencing a juvenile offender to a nonparolable life sentence is “ ‘especially harsh’ ” given that the offender “will almost inevitably serve ‘more years and a greater percentage of his life in prison than an adult offender.’ ”[21] Indeed, it “cannot be ignored” that “[a] 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only.”[22] As a result, the Supreme Court compared this “ultimate penalty” for juvenile offenders to the death penalty, which is the ultimate penalty for adult offenders, rather than to nonparolable life sentences for adult offenders.[23]
In particular, the Supreme Court questioned the ability of mandatory penalties to take into account the unique circumstances of youth: “mandatory penalties, by their nature, preclude a sentencer from taking account of an offender’s age and the wealth of characteristics and circumstances attendant to it.”[24] In imposing the harshest penalty available on a juvenile offender, then, “a sentencer misses too much if he treats every child as an adult.”[25] As a result, the Supreme Court required “that a sentencer follow a certain process — considering an offender’s youth and attendant characteristics — before imposing”[26] a nonparolable life sentence:
Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark *534 features — among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him — and from which he cannot usually extricate himself — no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth — for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.[27]
The Supreme Court invalidated any “sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders.”[28]
It is undisputed — and cannot be disputed — that Miller applies to all cases that were pending on direct appeal when the decision was issued on June 25, 2012, and that it applies to all juvenile offenders going forward.[29] What is in dispute in Carp and Davis is whether Miller applies to offenders whose direct appeals were *535 completed before June 25, 2012. After having filed motions for relief from judgment in their respective cases, defendants Eaymond Carp and Cortez Davis now appear before this Court, presenting that very issue.[30] On this question, to which we now turn, Miller was silent[31] and courts across the country are divided.[32]
*536 II. RETROACTIVITY UNDER FEDERAL LAW
A. ANALYSIS
In Teague v Lane and its progeny, the United States Supreme Court has explained when its new rules are retroactive under federal law and thereby apply to cases on collateral review.[33] The threshold inquiry is whether the Supreme Court has, in fact, issued a new rule of law. A new rule has been issued and the Teague analysis proceeds if “the precise holding[s]” in the Supreme Court’s previous cases did not “dictate the result” of the case being analyzed.[34]
Once the reviewing court determines that the Supreme Court issued a new rule of law in the case being analyzed, the reviewing court must then determine whether the new rule is a substantive rule or a procedural rule:
New substantive rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or *537 persons covered by the statute beyond the State’s power to punish. Such rules apply retroactively because they “necessarily carry a significant risk that a defendant stands convicted of ‘an act that the law does not make criminal’ “ or faces a punishment that the law cannot impose upon him. Bousley [v United States, 523 US 614, 620; 118 S Ct 1604; 140 L Ed 2d 828 (1998), quoting Davis v United States, 417 US 333, 346; 94 S Ct 2298; 41 L Ed 2d 109 (1974)].
New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise.[35]
A rule is procedural if it “regulate[s] only the manner of determining the defendant’s culpability” or if it “allocated] decisionmaking authority.”[36] On the other hand, “[a] decision that modifies the elements of an offense is normally substantive rather than procedural,” including, for example, a decision stating that “a certain fact [is] essential to the death penalty . . . ,”[37] Finally, if the new rule is determined to be procedural, then it applies retroactively only if it satisfies the two requirements of a watershed rule of criminal procedure: (1) it must be necessary to prevent an impermissibly large risk of an inaccurate conviction, and (2) it must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding.[38] One such watershed rule of criminal procedure was articulated in Gideon v Wain *538 wright,[39] which requires the appointment of counsel for any indigent defendant charged with a felony.[40]
B. APPLICATION
It is uncontested that Miller is a new rule, and we agree with the majority’s conclusion that “Miller imposed a hitherto-absent obligation on state and lower federal courts to conduct individualized sentencing hearings before imposing a sentence of life without parole on a juvenile homicide offender.”[41]
We disagree, however, with the majority’s conclusion that Miller is best characterized as a procedural ruling such that it applies retroactively to cases on collateral review only if it is a watershed rule of constitutional procedure. Admittedly, the distinction between rules of procedure and rules of substance “is not necessarily always a simple matter to divine.”[42] Generally, a substantive rule “placets] particular conduct or persons covered by the statute beyond the State’s power to punish,”[43] while a procedural rule “regulate[s] only the manner of determining the defendant’s culpability . . . .”[44]
State legislatures have the “substantive power to define crimes and prescribe punishments,”[45] subject to *539 constitutional limitations. The Supreme Court articulated one such limitation in Miller: after Miller, state legislatures no longer can mandate, like the Michigan Legislature did,[46] that a juvenile offender convicted of first-degree murder in the circuit court receive a nonparolable life sentence.[47] In Graham, the Supreme Court “recognized the severity of sentences that deny convicts the possibility of parole”[48] when it categorically barred a state from imposing a nonparolable life sentence (whether discretionary or mandatory) on a juvenile nonhomicide offender. While Miller does not prohibit a sentencer from imposing a nonparolable life sentence on a juvenile homicide offender in the appropriate case, the Supreme Court categorically barred mandatory nonparolable life sentences for such offenders.
After Miller, if a state chooses to permit the sentencing of juveniles to nonparolable life,[49] then the state must provide some procedure that requires the sentencer to consider the particular facts and circumstances of the crime and the offender. The Court of Appeals and, to some extent, the majority have placed particular importance on a single line in Miller: that the decision “mandates only that a sentencer follow a certain process . . . before imposing a particular pen *540 alty.”[50] However, the mere fact that Miller mandates “a certain process,” or has procedural implications, does not transform the decision itself into a procedural decision. To the contrary, Miller invalidated an entire “sentencing scheme” that “mandate[d] life in prison without possibility of parole for juvenile offenders.”[51]
The majority claims that the distinction between the “categorical bar” of a penalty and the “noncategorical bar” of a penalty “defines the critical element of the retroactivity analysis in Teague.”[52] This distinction, however, is not dispositive to the Teague analysis, which focuses on whether the decision is substantive or procedural, not on whether it is categorical or noncategorical. By elevating the categorical/noncategorical distinction in the way it does, the majority muddles the Teague analysis to state that noncategorical bars must be procedural in nature. Even if all categorical bars are substantive, it does not logically follow that all noncategorical bars must be procedural.[53] Rather, for the reasons stated later in this opinion, the fact that Miller did not categorically bar nonparolable life sentences for juvenile offenders does not negate the substantive import of its decision to invalidate mandatory nonparolable life sentences as applied to juvenile offenders.
The substantive nature of Miller’s holding becomes clearer upon considering that it did not invalidate mandatory sentencing schemes as applied to adult *541 offenders.[54] Rather, in Miller, the Supreme Court made one fact — the age of the offender at the time of the offense — determinative regarding whether a state or the federal government can mandate the imposition of a nonparolable life sentence.[55] As a result, Miller did not alter “only the manner of determining the defendant’s culpability,”[56] but instead also altered the range of punishments that must be available to impose on a juvenile offender.
After Miller, the offender’s age at the time of the offense determines which of two sentencing schemes applies to the offender — that is, whether the offender is subject to a mandatory nonparolable life sentence (because the offender is an adult) or whether the sentence must take into account the offender’s age and characteristics of youth, as well as the circumstances of the offense (because the offender is a juvenile).[57] While previously, in Michigan, juvenile offenders convicted of first-degree murder in the circuit court were subject to only one possible punishment — life imprisonment without the possibility of parole — after Miller, the prosecution must specifically request a nonparolable life sentence, rather than a term of years, after which the court must hold a hearing to consider the offender’s characteristics and the circumstances of the offense before *542 deciding whether to impose a nonparolable life sentence or a term of years.[58] As a result, age affects the range of sentences that can be imposed on someone convicted of first-degree murder in Michigan. It produces a class of persons subject to a different range of sentences than was previously mandated and thus reflects a substantive rule of law that applies retroactively under the Teague framework.
The majority analyzes what it deems the “form and effect” of Miller and concludes differently. Under its rationale, Miller is not retroactive in large part because the Supreme Court did not categorically bar a sentence as applied to a class of individuals, which it did in Roper and Graham. Rather, juvenile offenders sentenced to nonparolable life have been given a punishment that is within the power of the state to impose. The majority thus determines that Miller is more similar to cases involving the individualized imposition of the death penalty, which, the majority asserts, are cases involving new procedural rules.
The majority is insightful, to a point, by comparing Miller with Woodson v North Carolina, which struck down a sentencing scheme that mandated the death penalty upon conviction of certain offenses.[59] Indeed, after Woodson, the Supreme Court requires an individualized sentencing procedure if a state chooses to impose the *543 death penalty.[60] Woodson also illustrates the problem with the majority’s method of distinguishing procedural from substantive holdings. The majority claims that substantive holdings “produce a single invariable result, or a single effect, when applied to any defendant in the class of defendants to whom the rule is pertinent,” while procedural holdings “produce a range of results, or have multiple possible effects, when applied to different defendants in the class of defendants to whom the rule is pertinent.”[61] In requiring an individualized procedure before a state can impose the death penalty, however, Woodson placed a particular punishment beyond the power of the state to mandate. So too dad Miller place a particular punishment beyond the power of the state to mandate. The majority’s distinction fails to give appropriate import to these decisions that involve more than simply the creation of particular procedural rights.
While Woodson required a state to provide some sort of procedural mechanism before it could impose capital punishment, it only offered minimal guidance on what procedures are required and, specifically, on who should decide whether an individual was eligible to receive the death penalty. After Woodson, some states listed aggravating factors that rendered an offense eligible for the death penalty. The Supreme Court subsequently held, in Ring v Arizona, that the Sixth Amendment right to a jury trial requires a jury to determine the presence or absence of the aggravating factors that qualify an offender as death-eligible.[62]
*544 In Schriro v Summerlin, the Supreme Court determined that Ring was procedural, and therefore not retroactive, because the aggravating factors at issue there remained “subject to the procedural requirements the Constitution attaches to trial of elements.”[63] The prototypical procedural decision merely “allocated] decisionmaking authority.”[64] Unlike Ring, Miller does more than merely allocate decision-making authority. While Ring only “altered the range of permissible methods for determining whether a defendant’s conduct is punishable by death,”[65] Miller went beyond that and altered the range of punishments available to a juvenile homicide offender by requiring that a state’s mandatory minimum punishment be something less than nonparolable life. Indeed, it does not simply allocate decision-making authority but establishes that authority in the first instance. The majority implicitly recognizes this by observing that, as Ring shifted the decision-making authority for imposing capital punishment from the judge to the jury, Miller shifted the decision-making authority from one branch of government (the legislative) to another (the judiciary).[66] Put simply, Miller involved not just who exercises the decision-making authority for imposing a punishment, but what punishments must be considered.
*545 The majority glosses over the substantive import of this distinction, and in doing so ignores the fact that, both before and after Ring, there existed the possibility for a punishment less than death, while only after Miller does there exist the possibility for a juvenile homicide offender to receive a punishment less than nonparolable life.[67] While Miller indisputably contains a procedural component, its decision to expand the range of punishments that may be imposed on juvenile offenders convicted of homicide squarely places Miller in the category of substantive decisions.[68] No longer can Con *546 gress or a state legislature constitutionally choose to adopt a sentencing scheme that mandates the imposition of a nonparolable life sentence on juvenile homicide offenders.[69]
Indeed, if Miller were merely a procedural decision, the Supreme Court would not have examined — and found wanting — the penological aims of a state legislature’s substantive policy choice to impose a mandatory nonparolable life sentence on juvenile homicide offenders. In fact, in Miller, the Court explained that none of the permissible penological aims — retribution, deterrence, incapacitation, and rehabilitation — warrant mandatory nonparolable sentences for juvenile offenders.[70] Similarly, in Atkins v Virginia, the Supreme Court *547 examined the penological justifications for imposing the death penalty on mentally handicapped individuals and found those justifications lacking.[71]
Nevertheless, Atkins acknowledged that states are provided with considerable discretion to fashion procedures to determine whether an offender must be excluded from consideration of the death penalty:
Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in Ford v. Wainwright with regard to insanity, “we leave to the State [s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.”[72]
Miller likewise provided states with considerable discretion to determine how a juvenile offender is to be adjudged sufficiently culpable as an individual to warrant imposition of a nonparolable life sentence.[73] In *548 other words, after Atkins, a court must make an individual determination of whether an offender’s mental capacity precludes consideration of the death penalty.[74] After Miller, so too must a court make an individual determination of whether a juvenile offender’s youth and attendant characteristics preclude consideration of a nonparolable life sentence.[75] That Atkins required states to provide additional procedural safeguards to ensure that they complied with the substantive limitations of the Eighth Amendment does not negate its substantive nature,[76] just as Miller’s requirement of new procedural safeguards does not negate its substantive nature. In other words, neither Atkins nor Miller defined precisely the class of offenders precluded from a particular punishment; rather, fact-finders must examine individual culpability to determine whether a particular offender is eli *549 gible for that punishment. The broad deference thus afforded to states in the adjudication of the individualized hearings required under Atkins and Miller only reinforces the substantive nature of those holdings.
In the end, the majority strains to place Miller in a procedural box into which it will not comfortably fit. Miller is based on the substantive differences between juveniles and adults and the potentially reduced culpability of juveniles for the crimes that they commit. While there are procedural implications to the decision — as Miller itself acknowledged — the “form and effect” of the opinion, to use the majority’s phrase, is that the Eighth Amendment places a substantive limitation on how states can punish juvenile offenders. Accordingly, we would hold that Miller applies retroactively under federal law.
Even if we were to agree with the majority that Miller announced a new rule of criminal procedure, which we do not, an alternative basis supports our conclusion that Miller should apply retroactively. That is, as a separate and independent matter, we would hold that Miller applies retroactively under state law. It is to that analysis that we now turn.
III. RETROACTIVITY UNDER MICHIGAN LAW
A. ANALYSIS
This Court has consistently asserted that three factors are relevant in determining whether a new rule of criminal procedure should be applied retroactively under state law, even if such a new rule of criminal procedure does not apply retroactively under federal law:
(1) the purpose of the new rules; (2) the general reliance on the old rule[;] and (3) the effect of retroactive application of the new rule on the administration of justice.[77]
*550 The county prosecutors involved in these cases and the Attorney General argue that this Court should reverse this existing caselaw and rule that the retroactivity analysis under Michigan law is identical to the retroactivity analysis under federal law as articulated in Teague and its progeny. They claim that our caselaw is outdated because it applies the test for retroactivity that the Supreme Court abandoned in Teague.[78] The Supreme Court, however, has explicitly recognized that Teague’s approach to retroactivity incorporates federalism and comity concerns that “are unique to federal habeas review of state convictions.”[79] Therefore, “[i]f anything, considerations of comity militate in favor of allowing state courts to grant habeas relief to a broader class of individuals than is required by Teague.”[80] To this end, we duly concluded only six years ago that “a state court may use a different test to give broader effect to a new rule of criminal procedure established by the United States Supreme Court.”[81] There is no reason to abandon that approach now.
B. APPLICATION
As stated, the first factor that a reviewing court must consider in assessing a new rule’s retroactivity under state law is the purpose of the new rule. “Under the ‘purpose’ prong, a law may be applied retroactively when it ‘concerns the ascertainment of guilt or innocence[,]’ however, ‘a new rule of procedure . . . which *551 does not affect the integrity of the fact-finding process should be given prospective effect.’ ”[82] While sentencing procedures do not concern the ascertainment of guilt or innocence for the underlying offense, sentencing is a fact-finding process that allows the sentencer to ascertain an offender’s culpability for the offense.[83] Indeed, Miller mandates a new fact-finding process to determine whether a nonparolable life sentence is appropriate in a particular case. As a result, this factor supports the retroactive application of Miller.
*552 The second factor “examines whether individual persons or entities have been ‘adversely positioned ... in reliance’ on the old rule.”[84] Detrimental reliance on the old rule can apply to defendants who have “suffered harm as a result of that reliance” when they would have pursued an appeal that “would have resulted in some form of relief.”[85] In these cases, defendants were adversely positioned in reliance on the old rule because the sentencing judges did not have discretion to provide a sentence other than nonparolable life and because, until Miller, there was no basis in existing caselaw to appeal this lack of discretion.[86] Moreover, because the Supreme Court stated that imposition of nonparolable life sentences would be “uncommon”[87] after Miller, it is likely that many of the juvenile offenders already serving nonparolable life sentences would have, in fact, been sentenced to a term of years if they had received a sentencing hearing pursuant to Miller. As a result, this *553 factor also supports the retroactive application of Miller,[88] Nevertheless, this prong is not dispositive: a reviewing court must balance the detrimental reliance on the old rule “against the other . . . factors, as well as against the fact that each defendant. . . has received all the rights under the law to which he or she was entitled at the time.”[89]
*554 Indeed, applying the third factor takes into account this reliance on the old rule by examining whether applying the new rule retroactively would undermine the state’s “strong interest in finality of the criminal justice process . . . ,”[90] Nevertheless, this factor does not counsel against retroactivity in the way the majority asserts it does. Simply put, applying Miller retroactively would not affect the finality of convictions in this state. Rather, it would only require an individualized resentencing process for the relatively small class of prisoners sentenced to nonparolable life for homicides that they committed while juveniles.[91]
The majority concludes that requiring a sentencing hearing for offenders whose direct appeals are complete would be “burdensome and complicated,” if not “almost *555 impossibl[e]____”[92] Setting aside the majority’s doubt regarding the possibility of reconstructing the evidence required to conduct such a hearing, Miller’s goal is to determine, as best as possible, a juvenile offender’s ability to reform.[93] A sentencing hearing under Miller— particularly one conducted many years or even decades after the original offense — will assist in determining whether an offender “pose[s] a physical threat... to individuals living in our most vulnerable neighborhoods”[94] and, consequently, is irreparably corrupt.[95] This is particularly true in Michigan, where the Legislature has decided that a hearing conducted pursuant to Miller may take into account changed circumstances, including post-arrest conduct.[96] Accordingly, the majority errs by asserting that it is “fanciful” to believe that Miller can effectively be applied retroactively or that applying Miller retroactively will inevitably result in the “premature release of large numbers of persons” who “continue to pose a physical threat----”[97]
Because each of these factors supports retroactive application of Miller under state law, we would hold that *556 independent state law grounds exist to apply Miller retroactively.
IV CONCLUSION
For the reasons stated in this opinion, we respectfully dissent from the majority’s decision not to apply Miller v Alabama retroactively under either federal or state law. Instead, we would reverse the Court of Appeals in Carp and Davis and remand to the St. Clair Circuit Court and Wayne Circuit Court, respectively, for resentencing pursuant to MCL 769.25a.[98] Because Miller struck down sentencing schemes that applied mandatory nonparolable life sentences to juvenile homicide offenders, it altered the range of sentences that may be imposed on a juvenile homicide offender and effected a substantive change in the law. The majority has ruled that not all juvenile offenders will receive the benefit of Miller’s decision to foreclose a state from mandating a nonparolable life sentence, notwithstanding the Supreme Court’s assertion that only the “rare juvenile offender” will commit a crime that “reflects irreparable corruption” punishable by a nonparolable life sentence.[99] As a result, although Miller held that “children are different” as a matter of constitutional law,[100] today’s decision ensures that, merely because of the timing of a conviction and appeal, some children are more different than others.
CAVANAGH and MCCORMACK, JJ., concurred with Kelly, J.

 The phrase “juvenile offenders” throughout this opinion refers to the class of individuals who were convicted for crimes committed before reaching the age of 18.

 Miller v Alabama, 567 US_; 132 S Ct 2455, 2470; 183 L Ed 2d 407 (2012). See also Roper v Simmons, 543 US 551; 125 S Ct 1183; 161 L Ed 1 (2005); Graham v Florida, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

 Miller, 567 US at_; 132 S Ct at 2464

 We would also remand People v Eliason to the Berrien Circuit Court for resentencing pursuant to MCL 769.25, as the majority does.

 The Cruel and Unusual Punishments clause has been incorporated to the states through the Fourteenth Amendment. See Robinson v California, 370 US 660; 82 S Ct 1417; 8 L Ed 2d 758 (1962). Additionally, Article 1, § 16 of the 1963 Michigan Constitution provides that “cruel or unusual punishment shall not be inflicted . ...”

 For instance, the Virginia Declaration of Rights stated “[t]hat excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” 5 Kurland & Lerner, The Founders’ Constitution, p 373, quoting Virginia Declaration of Rights, § 9 (June 12, 1776).

 The English Bill of Rights of 1689 provided “[t]hat excessive bail ought not to be required, nor excessive fines imposed; nor cruel and unusual punishments inflicted.” 5 Kurland & Lerner, The Founders’ Constitution, p 369, quoting the English Bill of Rights, 1W & M, 2d sess, ch 2, § 10 (December 16, 1689).

 Granucci, “Nor Cruel and Unusual Punishments Inflicted:” The Original Meaning, 57 Cal L Rev 839, 845-846 (1969) (The Magna Carta “clearly stipulated as fundamental law a prohibition of excessiveness in punishments!.]”). Caselaw further establishes “a common law prohibition against excessive punishments in any form,” even if it remains unclear “[w]hether the principle was honored in practice . . . .” Id. at 847.

 Atkins v Virginia, 536 US 304, 311; 122 S Ct 2242; 153 L Ed 2d 335 (2002), quoting Trop v Dulles, 356 US 86, 100; 78 S Ct 590; 2 L Ed 2d 630 (1958) (opinion by Warren, C.J.).

 See Weems v United States, 217 US 349, 373; 30 S Ct 544; 54 L Ed 793 (1910) (“[I]f we are to attribute an intelligent providence to its advocates we cannot think that it was intended to prohibit only practices like the Stuarts, or to prevent only an exact repetition of history.”); id. (“[0]ur contemplation cannot be only of what has been but of what may be.”).

 Id. at 378. More recently, the Court has explained that the clause “ ‘must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.’ ” Atkins, 536 US at 311-312, quoting Trap, 356 US at 101 (opinion by Warren, C.J.).

 Miller, 567 US at_; 132 S Ct at 2464.

 Roper, 543 US at 578.

 Graham, 560 US at 82.

 Miller, 567 US at_; 132 S Ct at 2460.

 Id. at_; 132 S Ct at 2464. The Court cited research developments in science and social science that show “ ‘fundamental differences between juvenile and adult minds’ — for example, in ‘parts of the brain involved in behavior control.’ ” Id. at_; 132 S Ct at 2464, quoting Graham, 560 US at 68. Specifically, the Court cited a paper by Laurence Steinberg & Elizabeth Scott, Less Guilty by Reason of Adolescence, which explains that there are two components to the diminished culpability of *532 adolescents: the brain development that continues to occur during adolescence and psychosocial factors limiting adolescents’ emotional maturity, such as “(a) susceptibility to peer influence, (b) attitudes toward and perception of risk, (c) future orientation, and (d) the capacity for self-management.” Steinberg & Scott, Less Guilty by Reason of Adolescence, 58 Am Psychologist 1009, 1012 (2003).

 Miller, 567 US at_; 132 S Ct at 2464, quoting Roper, 543 US at 569-570 (citations omitted; alterations in original).

 Miller, 567 US at_; 132 S Ct at 2465.

 Id. at_; 132 S Ct at 2465.

 Id. at_; 132 S Ct at 2466, quoting Graham, 560 US at 76.

 Miller, 567 US at_; 132 S Ct at 2466, quoting Graham, 560 US at 70.

 Graham, 560 US at 70-71.

 Miller, 567 US at_132 S Ct at 2466.

 Id. at_; 132 S Ct at 2467.

 Id. at_; 132 S Ct at 2468.

 Id. at ; 132 S Ct at 2471.

 Id. at ; 132 S Ct at 2468 (citations omitted).

 Id. at_; 132 S Ct at 2469.

 “When a decision of this Court results in a ‘new rule,’ that rule applies to all criminal cases still pending on direct review.” Schriro v Summerlin, 542 US 348, 351; 124 S Ct 2519; 159 L Ed 2d 442 (2004). A case becomes final on direct review “for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.” Caspari v Bohlen, 510 US 383, 390; 114 S Ct 948; 127 L Ed 2d 236 (1994). Moreover, the Legislature recognized this when it enacted new procedures for sentencing juvenile offenders in compliance with Miller. See MCL 769.25, added by 2014 PA 22. As a result, we would remand Eliason to the *535 Berrien Circuit Court for resentencing pursuant to MCL 769.25, as the majority does, because that case was still pending on direct review when Miller was decided.

 See MCR 6.501 et seq.

 For the reasons explained later in this opinion, the fact that Miller failed to categorically bar imposition of a nonparolable life sentence for juvenile offenders does not require the conclusion that Miller is not retroactive. We similarly deem inconclusive as evidence of retroactivity the fact that the Supreme Court did not distinguish Miller from a companion case appearing before the Supreme Court on collateral review. See Miller, 567 US at ; 132 S Ct at 2461-2462, 2475; Jackson v Norris, 2013 Ark 175; 426 SW3d 906 (2013) (applying Miller in that companion case). Although the Supreme Court indicated in Teague v Lane that “implicit in the retroactivity approach we adopt today, is the principle that habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to all defendants on collateral review,” Teague v Lane, 489 US 288, 316; 109 S Ct 1060; 103 L Ed 2d 334 (1989) (opinion by O’Connor, J.), it has only inconsistently followed that approach. See Chaidez v United States, 568 US_; 133 S Ct 1103; 185 L Ed 2d 149 (2013) (holding that Padilla v Kentucky, 559 US 356; 130 S Ct 1473; 176 L Ed 2d 284 (2010), did not apply retroactively notwithstanding the fact that Padilla appeared before the Supreme Court on collateral review).

 For example, state appellate courts in California, In re Rainey, 224 Cal App 4th 280; 168 Cal Rptr 3d 719;_P3d_(2014); Illinois, People v Davis, 2014 Ill 115595; 379 Ill Dec 381; 6 NE3d 709 (2014); Iowa, State v Ragland, 836 NW2d 107 (Iowa, 2013); Massachusetts, Diatchenko v Dist Att’y, 466 Mass 655; 1 NE3d 270 (2013); Mississippi, Jones v State, 122 So 3d 698 (Miss, 2013); Nebraska, State v Mantich, 287 Neb 320; 842 NW2d 716 (2014); and Texas, Ex parte Maxwell, 424 SW3d 66 (Tex Crim App, 2014), have all ruled in favor of Miller’s retroactivity. In contrast, state appellate courts in Alabama, Williams v State,_So 3d_(Ala Crim App, 2014); Louisiana, State v Tate, La 2012-2763; 130 So 3d 829 (November 5, 2013); Minnesota, Chambers v State, 831 NW2d 311 (Minn, 2013); and Pennsylvania, Commonwealth v Cunningham, 81 A3d 1 (Pa, 2013), have ruled that Miller is not retroactive. Additionally, the appel *536 late courts in Florida have reached opposite conclusions on the question of retroactivity. Falcon v State, 111 So 3d 973 (Fla Dist Ct App, 2013) (concluding that Miller did not apply retroactively), lv gtd 137 So 3d 1019 (Fla, 2013); Toye v State, 133 So 3d 540 (Fla Dist Ct App, 2014) (concluding that Miller applied retroactively).

 Teague, 489 US 288. Although the lead opinion in Teague was not supported in whole by a majority of the court, the Teague retroactivity framework has subsequently been adopted by a majority of the Court. Penry v Lynaugh, 492 US 302; 109 S Ct 2934; 106 L Ed 2d 256 (1989), overruled in part on other grounds by Atkins, 536 US 304. In Penry, the majority also determined that the Teague framework applied to capital punishment cases. Because sentencing a juvenile offender to a nonparolable life sentence is the “ultimate penalty for juveniles,” Miller, 567 US at_; 132 S Ct at 2466, the Teague framework similarly applies to nonparolable life sentences for juvenile offenders.

 Saffle v Parks, 494 US 484, 490; 110 S Ct 1257; 108 L Ed 2d 415 (1990).

 Summerlin, 542 US at 351-352 (most citations omitted).

 Id. at 353 (emphasis omitted).

 Id. at 354.

 Whorton v Bockting, 549 US 406, 417-418; 127 S Ct 1173; 167 L Ed 2d 1 (2007), citing Summerlin, 542 US at 356.

 Gideon v Wainwright, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963).

 Whorton, 549 US at 419 (stating that Gideon was a watershed rule of constitutional procedure within the meaning of Teague).

 Ante at 473. While Miller applied principles contained in several of the Court’s Eighth Amendment precedents, the “precise holding[s]” of those precedents did not “dictate the result” of Miller. See Saffle, 494 US at 490.

 People v Carp, 298 Mich App 472, 512; 828 NW2d 685 (2012), citing Robinson v Neil, 409 US 505, 509; 93 S Ct 876; 35 L Ed 2d 29 (1973).

 Summerlin, 542 US at 352.

 Id. at 353 (emphasis omitted).

 Jones v Thomas, 491 US 376, 381; 109 S Ct 2522; 105 L Ed 2d 322 (1989).

 See MCL 750.316 (stating that first-degree murder shall be punished by imprisonment for life); MCL 769.1(1) (stating that a juvenile convicted of first-degree murder shall be sentenced “in the same manner as an adult”); MCL 791.234(6)(a) (stating that someone sentenced to life imprisonment for first-degree murder “is not eligible for parole”).

 Indeed, the majority acknowledges that “[i]t thus seems certain as a result of Miller that a considerable number of juvenile defendants who would previously have been sentenced to life without parole for the commission of homicide offenses will have a lesser sentence meted out.” Ante at 473.

 Graham, 560 US at 70.

 Michigan has recently done so. 2014 PA 22.

 Miller, 567 US at_; 132 S Ct at 2471.

 Id. at_; 132 S Ct at 2469 (emphasis added).

 Ante at 487 n 16.

 The division among our nation’s courts with regard to whether this proposition is correct or incorrect suggests that our nation’s jurisprudence would benefit from a clarification of the substantive/procedural distinction.

 In Michigan, for instance, first-degree murder remains punishable by life in prison without the possibility of parole. MCL 750.316; MCL 791.234(6).

 In Summerlin, the Supreme Court explained that a decision making “a certain fact essential to the death penalty” is a substantive rule of law within the Teague framework. Summerlin, 542 US at 354.

 Summerlin, 542 US at 353 (emphasis altered).

 Someone who is convicted of first-degree murder committed as an adult in Michigan is still subject to the mandatory penalty of life in prison without the possibility of parole, MCL 750.316; MCL 791.234(6)(a), while a juvenile offender is no longer subject to the same mandatory sentence. MCL 769.25.

 It is particularly relevant that Miller left considerable discretion for states to craft procedural mechanisms for ensuring the protection of a juvenile defendant’s Eighth Amendment rights. The Legislature exercised such discretion in response to Miller, 2014 PA 22, adding MCL 769.25.

 Woodson v North Carolina, 428 US 280; 96 S Ct 2978; 49 L Ed 2d 944 (1976). See also Sumner v Shuman, 483 US 66; 107 S Ct 2716; 97 L Ed 2d 56 (1987), which similarly struck down a sentencing scheme that mandated the death penalty upon conviction of certain offenses committed while serving a nonparolable life sentence.

 If the Supreme Court had definitively held Woodson to be a procedural ruling, then it would he difficult to distinguish Miller. However, if the Supreme Court has not ruled that Woodson is retroactive, as the majority posits, then neither has it ruled that Woodson is only prospective.

 Ante at 465.

 Ring v Arizona, 536 US 584; 122 S Ct 2428; 153 L Ed 2d 556 (2002).

 Summerlin, 542 US at 354.

 Id. at 353.

 Id. (emphasis added). Contrary to the majority’s claim, ante at 484 n 14, Ring did not invalidate Arizona’s entire capital punishment sentencing scheme because both before and after Ring the same substantive punishments were available for offenders in Arizona. Rather, it shifted decision-making authority within that sentencing scheme from the judge to the jury. By contrast, in Miller, the Supreme Court invalidated any sentencing scheme that mandated a nonparolable life sentence by requiring the sentencer to consider some additional sentence — whether parolable life, a term of years (as the Michigan Legislature chose), or both.

 Ante at 484-485.

 Interestingly, the majority suggests that Justice Breyer’s concurring opinion in Miller, had it received majority support, would he deemed a substantive rule and thus would apply retroactively. Ante at 468 n 6. Justice Breyer would have conditioned the state’s ability to impose a nonparolable life sentence on whether the individual homicide offender “ ‘killted] or intend[ed] to kill’ ” the victim. Miller, 567 US at_; 132 S Ct at 2475 (Breyer, J., concurring), quoting Graham., 560 US at 69 (alterations in original). But both Justice Breyer’s concurrence and Justice Kagan’s majority opinion condition the imposition of a nonparolable life sentence on an assessment of a particular defendant’s culpability for a homicide offense and allow only a subset of individuals convicted of first-degree murder to he eligible for a nonparolable life sentence. Accordingly, the distinction that the majority creates between the majority and concurring opinions in Miller is without a difference and counsels in favor of applying Miller retroactively: while previously no limitation existed before a state could impose a nonparolable life sentence as punishment for a homicide offense, now an offender’s individual culpability in the homicide must he assessed. The Miller majority’s individualized procedure contains additional factors that govern whether a defendant may be punished with nonparolable life, and Justice Breyer’s proposed individualized procedure would work in the same manner. Each invalidates the substantive, mandatory punishment that certain states imposed for juvenile offenders convicted of homicide.

 The majority claims that “[w]e are bound to abide by” the Supreme Court’s understanding of “when a new rule ‘alters the range’ of available punishments,” and suggests that this applies only when the rule “ ‘placets] particular conduct or persons covered by the statute beyond the State’s power to punish.’ ” Ante at 479, quoting Summerlin, 542 US at 352 (alteration in original). However, Summerlin’s description of a substantive rule is inclusive and not exclusive, and the majority over *546 states the Supreme Court’s position when it forecloses, on the basis of that statement in Summerlin, the possibility that a substantive decision is one that “makes a previously unavailable lesser punishment available to the sentencer ....” Ante at 479.

 To the majority, a rule that “merely expands the range of possible punishments that may be imposed on the defendant” is procedural because, in theory, the state still has the power to punish a juvenile offender with a nonparolable life sentence. Ante at 483 (emphasis omitted). However, this distinction is misplaced because the Supreme Court nevertheless placed a substantive limitation on a state’s policy decisions: after Miller the state no longer has the power to mandate a nonparolable life sentence as punishment for a crime committed by a juvenile offender.

 For instance, retribution as a penological rationale “relates to an offender’s blameworthiness” and, accordingly, “ ‘the case for retribution is not as strong with a minor as with an adult.’ ” Miller, 567 US at_; 132 S Ct at 2465, quoting Graham, 560 US at 71 (citation and quotation marks omitted). Deterrence is similarly limited because “ ‘the same characteristics that render juveniles less culpable than adults’ — their immaturity, recklessness, and impetuosity — make them less likely to consider potential punishment” before committing a crime. Miller, 567 US at_; 132 S Ct at 2465, quoting Graham, 560 US at 72 (citation and quotation marks omitted). Incapacitation “would require ‘mak[ing] a judgment that [the offender] is incorrigible’ — but ‘incorrigibility is inconsistent with youth.’ ” Miller, 567 US at_; 132 S Ct at 2465, quoting Graham, 560 US at 72-73 (citation and quotation marks omitted) (first *547 alteration in original). See also Steinberg & Scott, Less Guilty by Reason of Adolescence, 58 Am Psychologist at 1014 (“Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood ....”). Nor can a nonparolable life sentence “be justified by the goal of rehabilitation” because it “forswears altogether the rehabilitative ideal” and “makes an irrevocable judgment about that person’s value and place in society.” Graham, 560 US at 74. See also Steinberg & Scott, Less Guilty by Reason of Adolescence, 58 Am Psychologist at 1015 (stating that because the criminal behavior of juvenile offenders, “is quite different from that of typical adult criminals,” the diagnosis of antisocial personality disorder is not made before the age of 18).

 Atkins, 536 US at 321 (“We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty.”).

 Id. at 317, quoting Ford v Wainwright, 477 US 399, 405, 416-417; 106 S Ct 2595; 91 L Ed 2d 335 (1986) (citation omitted) (alterations in original).

 If, for instance, the Supreme Court were to hold in a subsequent decision that the Sixth Amendment right to a jury trial requires a jury to determine a juvenile offender’s culpability for purposes of imposing a *548 nonparolable life sentence, then that hypothetical future holding would be considered procedural rather than substantive. See Summerlin, 542 US 348.

 This individual determination, made under state law, also shows the weakness of the majority’s “form and effect” interpretation of Teague, which requires a substantive decision to have uniform effect. Because Atkins left states with considerable discretion to define mental retardation, a person whose mental capacity precludes consideration of the death penalty in one state could nevertheless be subject to the death penalty in a different state. The majority struggles to fit Atkins within its “form and effect” interpretation — particularly given that the state’s exercise of its discretion both in Miller and Atkins is to ensure that only culpable offenders are subject to the ultimate punishment available to juvenile offenders and adults, respectively.

 Furthermore, just as “some characteristics of mental retardation undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards,” Atkins, 536 US at 317, some characteristics of youth likewise undermine the existing procedural protections in our justice system, including the right to the effective assistance of counsel, Miller, 567 US at _; 132 S Ct at 2468 (suggesting that a juvenile offender may be prejudiced because of “his incapacity to assist his own attorneys”).

 In re Holladay, 331 F3d 1169, 1172 (CA 11, 2003) (holding that Atkins applies retroactively).

 People v Sexton, 458 Mich 43, 60-61; 580 NW2d 404 (1998).

 See Linkletter v Walker, 381 US 618, 626; 85 S Ct 1731; 14 L Ed 2d 601(1965).

 Danforth v Minnesota, 552 US 264, 279; 128 S Ct 1029; 169 L Ed 2d 859 (2008).

 Id. at 279-280.

 People v Maxson, 482 Mich 385, 392 n 3; 759 NW2d 817 (2008). See also id. at 404-405 (Cavanagh, J., dissenting).

 Maxson, 482 Mich at 393, quoting Sexton, 458 Mich at 63 (citation and quotation marks omitted).

 See McConnell v Rhay, 393 US 2, 3-4; 89 S Ct 32; 21 L Ed 2d 2 (1968) (stating that sentencing relates to the integrity of the fact-finding process under Linhletter). The majority reads McConnell narrowly on the ground that McConnell implicated the right to counsel during the sentencing process. However, it did so precisely because the sentencing process is part of the fact-finding process. Indeed, this Court’s own jurisprudence involving sentencing describes the sentencing process as requiring the sentencing court to make “factual determination[s].” See, e.g., People v Babcock, 469 Mich 247, 264; 666 NW2d 231 (2003) (citations and quotation marks omitted). The fact that this Court has not yet had the opportunity to analyze the sentencing process in the context of retroactivity does not prevent the principles that we have articulated from applying in this context.
Contrary to the majority’s claim, it is irrelevant that the Supreme Court has abandoned the pre-Teague framework in determining the application of this state’s independent retroactivity jurisprudence. Indeed, saying that this Court has “no obligation ... to forever maintain the Linkletter test in accordance with every past federal understanding,” ante at 500, classifying the foundational caselaw of Michigan’s retroactivity test as “defunct,” ante at 500, and stating that “only the extraordinary new rule of criminal procedure,” whatever that may mean, “will be applied retroactively under Michigan’s test when retroactivity is not already mandated under Teague," ante at 497 comes perilously close to deciding to maintain the principles underlying this state’s traditional retroactivity framework only when Teague and its progeny militate in favor of retroactivity. We would not turn Michigan’s retroactivity framework into such a parchment barrier. See Federalist No. 48 (James Madison) (Wright ed, 2002), p 343.

 Maxson, 482 Mich at 394 (citation omitted).

 Id. at 394, 396 (emphasis omitted).

 Indeed, Davis’s sentencing judge sought to sentence him to a term of years instead of a nonparolable life term and was overturned on the prosecution’s appeal. This fact alone illustrates how defendants as a class were adversely positioned in reliance on the old rule — after Miller, every defendant is entitled to “some form of relief,” i.e., an individualized sentencing hearing that allows the sentencer to consider a punishment less than nonparolable life. Maxson, 482 Mich at 396 (emphasis omitted). Unlike in Maxson, we cannot assume that juvenile offenders did not appeal their nonparolable life sentences “because of factors unrelated to, and existing before, the old rule.” Id. Instead, we must assume that any failure to appeal occurred simply because the old rule provided no judge with discretion to deviate from a nonparolable life sentence. That Michigan caselaw upheld the constitutionality of our pre-Miller sentencing scheme, see People v Launsburry, 217 Mich App 358; 551 NW2d 460 (1996), further supports defendants’ detrimental reliance on the old rule because it reduced the likelihood that a mandatory nonparolable life sentence would have been overturned on appeal.

 Miller, 567 US at_; 132 S Ct at 2469.

 It bears repeating Miller’s statements that “appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon” and that only the “rare juvenile offender” will commit a crime that “reflects irreparable corruption.” Id. at_; 132 S Ct at 2469 (emphasis added) (citations and quotation marks omitted). As a result, the majority’s claim that it is “speculative at best” to presume that juvenile offenders will gain relief under Miller, is indeed questionable. Ante at 509.
Furthermore, contrary to the majority’s assertion that chronological age at the time of the offense “will weigh relatively heavily at sentencing hearings,” ante at 509 n 35, a juvenile offender’s chronological age is only one relevant consideration in determining whether the offender deserves a “sentence of life (and death) in prison.” Miller, 567 US at_; 132 S Ct at 2468. Indeed, under Miller, a sentencer must consider the offender’s chronological age, mental and emotional development, family and home environment, and potential for rehabilitation, along with the circumstances of the offense, which include the individual offender’s role in the crime and whether familial and peer pressures may have affected the juvenile. Id. at _; 132 S Ct at 2468. Simply stated, under Miller, a sentencer must “examine all these circumstances before concluding that life without any possibility of parole [is] the appropriate penalty.” Id. at_; 132 S Ct at 2469 (emphasis added). The majority, however, places “significant weight” on a juvenile’s chronological age at the time of the offense. Ante at 509 n 35. By stating that a juvenile who nears the age of majority at the time of the offense is “least likely” to be afforded “special leniency,” ante at 508, that a juvenile “may even turn 18 during the proceedings related to the offense,” ante at 509 n 35, that a nonparolable life sentence is “increasingly likely to be permissible” to the extent the offender’s age nears the age of majority, ante at 470 n 9, and that age “may well constitute the single best factor” for determining culpability, ante at 509 n 35, the majority makes generalizations that ignore Miller’s multifaceted and holistic examination of the offender’s individual characteristics.

 Maxson, 482 Mich at 397. The majority concludes that this second factor “must be considered both from the perspective of prosecutors across the state when prosecutors faithfully abided by the constitutional *554 guarantees in place at the time of a defendant’s conviction,” and “from the collective perspective of the 334 defendants who would be entitled to resentencing if the new rule were applied retroactively.” Ante at 503. However, that principle is not found in this Court’s traditional caselaw regarding retroactivity, and the authoring justice’s own examination of retroactivity in People v Maxson did not engage in such an additional inquiry. See Maxson, 482 Mich at 394-397. Indeed, as Maxson acknowledged, our traditional caselaw regarding retroactivity requires us to balance the other factors “against the fact that each defendant... has received all the rights under the law to which he or she was entitled at the time.” Id. at 397. The majority’s application of our retroactivity caselaw gives the state’s reliance interests undue weight by factoring those interests twice — once as part of the second factor and again as part of the third factor. The majority has not pointed to any reasons that would support revisiting the authoring justice’s examination of retroactivity in Maxson in the six years since it was decided.

 Maxson, 482 Mich at 397.

 If Miller resentencing hearings were to be evenly divided among the circuit court bench, each circuit judge would receive, on average, two additional sentencing hearings. That is hardly a strain on the state’s judicial resources. This is in stark contrast to the potential of “guilty-pleading defendants whose convictions [had] become final [to] inundate the appellate process with new appeals” that, in part, prompted a majority of this Court to reject the retroactivity of Halbert v Michigan, 545 US 605; 125 S Ct 2582; 162 L Ed 2d 552 (2005). Maxson, 482 Mich at 398.

 Ante at 510. The law, and particularly judicial proceedings, are frequently burdensome and complicated. That the Constitution sometimes requires burdensome and complicated proceedings should not impede our duty to ensure that constitutional rights are enforced.

 The majority’s emphasis on reconstructing the circumstances of the crime and the impulsiveness of the juvenile offender’s activity is misplaced. As a result, the majority misinterprets the hearing called for under Miller as entirely backward-looking. Miller’s goal is to ensure that the sentencing court considers the evidence that it has available to it in deciding whether an individual offender has the ability to reform.

 Ante at 510.

 See Miller, 567 US at_; 132 S Ct at 2469.

 See MCL 769.25(6) (allowing the sentencing court to consider at the sentencing hearing under Miller “any other criteria relevant to its [sentencing] decision, including the individual’s record while incarcerated”).

 Ante at 510-511.

 As previously indicated, we would also remand Eliason to the Berrien Circuit Court for resentencing pursuant to MCL 769.25, as the majority does.

 Miller, 567 US at_; 132 S Ct at 2469 (emphasis added) (citations and quotation marks omitted).

 Id. at_; 132 S Ct at 2470.